# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

ROBERT GLENN BRUNO,

      Petitioner,

v.                                                      Case No. 8:19-cv-172-WFJ-NHA

SECRETARY, DEPARTMENT OF
CORRECTIONS,

      Respondent.

_____/

## <u>ORDER</u>

Robert Glenn Bruno, a Florida prisoner, timely filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (Docs. 1, 11). Respondent filed a response opposing the petition. (Doc. 18). Mr. Bruno filed a reply. (Doc. 30). After careful review, the petition is **DENIED**.

## I.    Background

On the evening of August 1, 2000, Mr. Bruno murdered a man during a "road rage" incident in Tampa, Florida. (Doc. 18-3, Ex. 19, at 213-15). Earlier that day, Mr. Bruno had eaten lunch at a Hooters restaurant with his longtime friend Robert Nash and his girlfriend Heather Baker. (*Id.* at 232-33, 252-53, 401). The three later met up for drinks at a Carrabba's restaurant. (*Id.* at 233). Around 7:30 p.m., they left Carrabba's in Mr. Bruno's car. (*Id.* at 233-35, 312). Ms. Baker drove, Mr. Bruno sat in the front passenger seat, and Mr. Nash sat in the back. (*Id.* at 235, 313-14). A female driver "cut [them] off" on South Dale Mabry Highway. (*Id.* at 239, 312). Ms. Baker was not "upset," but Mr. Bruno became

1

"aggravated." (*Id.* at 239). He called the driver a "b*tch," yelled at her through an open window, and grabbed the steering wheel in an attempt to "run her off the road." (*Id.* at 239-40). Mr. Bruno also "kept pulling" the emergency brake, causing the driver to "almost rear-end[] them." (*Id.* at 240, 315). The driver eventually stopped her car and decided she "wasn't moving until they were gone." (*Id.* at 315). Ms. Baker drove off and headed to Mr. Bruno's house. (*Id.* at 234-35).

Later that evening, the three left the house with plans to go to a nightclub in Hyde Park. (*Id.* at 205-07, 262, 269). This time, Mr. Bruno drove, Ms. Baker sat in the front passenger seat, and Mr. Nash sat in the back. (*Id.* at 402). As they headed south on Veterans Expressway, a car merged onto the highway and "cut in front of [them]." (*Id.* at 208). Mr. Bruno became "upset." (*Id.* at 208-09). He said, "[N]obody cuts [me] off," "called the guy an assh*le," "and then intentionally . . . got in front of the guy and slammed on his brakes." (*Id.* at 209). The two cars ended up "[s]ide by side," with each driver "cussing" at the other. (*Id.*) Mr. Bruno and the victim proceeded to chase each other down the highway, going "80 to 90 miles an hour." (*Id.* at 210-11).

The chase ended near the Interstate 275 on-ramp. (*Id.* at 404). The victim stopped his car in front of Mr. Bruno's car. (*Id.* at 212-14). Mr. Bruno, Mr. Nash, and Ms. Baker got out. (*Id.*) Mr. Nash took "a couple steps" toward the victim's car, hoping to "[s]care him." (*Id.* at 405-06). Before Mr. Nash could reach the car, however, Mr. Bruno pulled out a handgun and shot the victim in the head. (*Id.* at 212-15, 407-08). At the time, the victim was sitting in the driver's seat with his seatbelt fastened. (*Id.* at 149-150, 759). After the shots were fired, Mr. Nash "dropped to the ground," and Mr. Bruno "yelled . . . to get back

in the car." (*Id.* at 408) The three returned to the car, and Mr. Bruno drove off. (*Id.* at 410-11). The victim died of "a gunshot wound to the head." (*Id.* at 567).

Back inside the car, Mr. Nash yelled at Mr. Bruno, asking him why he had "pull[ed] the gun." (*Id.* at 410). Mr. Bruno said he had shot "[i]n the air." (*Id.* at 411). At the time, neither Mr. Nash nor Ms. Baker knew that the victim had been shot. (*Id.* at 222, 411). The three eventually went to the nightclub in Hyde Park. (*Id.* at 411-12). They left together around closing time. (*Id.* at 220, 413). Mr. Bruno dropped Mr. Nash off at a convenience store. (*Id.* at 414). He offered Mr. Nash the gun, saying, "[You] might need this. There's a couple of [n-words] standing at the store." (*Id.*) Mr. Nash declined the offer. (*Id.*) Mr. Bruno and Ms. Baker then returned to Mr. Bruno's house. (*Id.* at 221).

The next day, Mr. Nash learned that the victim had been "killed" during the road rage incident. (*Id.* at 415). Later that day, he met up with Mr. Bruno and Ms. Baker. (*Id.* at 416-17). While Ms. Baker was in the restroom, Mr. Nash asked Mr. Bruno to explain how the victim died "if he shot in the air." (*Id.* at 419). Mr. Bruno said, "[M]aybe it ricocheted or something." (*Id.* at 420).

Three days later, Mr. Bruno and Mr. Nash met up again. (*Id.* at 421-22). Mr. Bruno finally admitted that he had "fired at the car . . . to scare the person." (*Id.* at 423). He also said he had thrown the murder weapon "in the bay." (*Id.* at 423-24). Mr. Bruno mentioned that he had moved the car to "[s]omebody's house in Tampa Palms," and he asked Mr. Nash to retrieve it. (*Id.* at 425). Mr. Nash declined because he "didn't want to get in any more trouble than [he was] already in." (*Id.* at 425-26). Mr. Bruno then asked Mr. Nash to help him "rob a bank" for "money to get out of town." (*Id.* at 430). Again, Mr. Nash

declined. (*Id.*) Finally, Mr. Bruno told Mr. Nash that "he'd put [Ms. Baker] on a plane" and "get her out of here." (*Id.* at 423).

Law enforcement found a Federal .45 caliber Hydra-Shok shell casing at the crime scene. (*Id.* at 530-31). Officers subsequently recovered a box of .45 caliber bullets from Mr. Bruno's storage unit. (*Id.* at 373-75). These bullets were manufactured by Federal, and they were the "same make" as the shell casing recovered from the crime scene. (*Id.* at 613-14).

Mr. Nash and Ms. Baker ultimately agreed to cooperate with law enforcement. (*Id.* at 487-89, 497-99). Mr. Bruno was arrested and charged with second-degree murder. (Doc. 18-2, Ex. 6). The case went to trial. Mr. Bruno testified in his defense and claimed that Mr. Nash was the shooter. (Doc. 18-3, Ex. 19, at 141, 661-64). The jury found Mr. Bruno guilty as charged. (*Id.*, Ex. 20). The trial court sentenced him to life imprisonment. (*Id.*, Ex. 23). After an unsuccessful direct appeal, Mr. Bruno moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Ex. 27; Doc. 18-4, Exs. 38, 39, 40, 41). The postconviction court rejected Mr. Bruno's claims, and the appellate court affirmed without opinion. (*Id.*, Exs. 42, 43, 46; Doc. 18-6, Ex. 49; Doc. 18-8, Ex. 61). This federal habeas petition followed. (Docs. 1, 11).

## II.    Standards of Review

### A.    AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or

treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in

5

federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The appellate court affirmed Mr. Bruno's conviction, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When an appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

### B.    Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th

Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

### C.    Ineffective Assistance of Counsel

Mr. Bruno alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Mr. Bruno must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, Mr. Bruno must show "a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## III.    Discussion

### A.    Ground One—Failure to Obtain Suppression of .45 Caliber Ammunition

Mr. Bruno faults trial counsel for failing to obtain suppression of the .45 caliber ammunition recovered from his storage unit. (Doc. 11 at 1). As noted above, this ammunition had the same "make" and "manufacturer" as the .45 caliber shell casing found at the crime scene. (Doc. 18-3, Ex. 19, at 613-14). In August 2000, shortly after his arrest

for the road rage murder, law enforcement searched Mr. Bruno's storage unit as part of an unrelated investigation into a bank robbery that had taken place one year earlier. (Doc. 18-2, Ex. 4, at 2534).

According to the affidavit in support of the search warrant, a confidential informant reported that Mr. Bruno had been "bragging, to numerous people, that he had committed bank robberies, and that the dye-stained money from the bank [was] being kept inside his father's house." (*Id.*) Law enforcement searched the house and found a five-dollar bill that "tested positive for tear gas and dye." (*Id.* at 2535). Police obtained additional "information" after Mr. Bruno was arrested for the road rage murder. (*Id.*) Specifically, Mr. Nash and another friend of Mr. Bruno's (Mark Schneck) told law enforcement that "after the robber[y] on August 6, 1999," Mr. Bruno "went to [Mr.] Schneck's home where he counted the proceeds from the robber[y], and even attempted to . . . bleach the dye-stained money using [Mr.] Schneck's washing machine." (*Id.*) Mr. Schneck also said that Mr. Bruno "kept stolen cars and other things in a 'shop' in Drew Park and . . . was afraid that the FBI was going to find out about the shop." (*Id.*) Law enforcement subsequently intercepted a jail call between Mr. Bruno and an ex-girlfriend in which he discussed a "storage unit in Drew Park, which was referred to[] in the call as 'the shop.'" (*Id.*) Mr. Bruno said that "all [his] sh*t [was] in there," which the affiant (Detective James Iverson) interpreted as a reference to "tools, such as guns, or fruits of the crimes such as dye-stained currency." (*Id.*) Based on this information, law enforcement obtained a warrant to search Mr. Bruno's storage unit, where they located the .45 caliber ammunition. (*Id.* at 2536).

Defense counsel ultimately moved to suppress all evidence obtained from the storage unit. (*Id.*, Ex. 12). He argued that (1) the seized property was not adequately "described in the warrant," (2) the warrant was "overbroad" and "nearly authorize[d] a general search" of the storage unit, (3) the affidavit failed to establish "probable cause to believe that items of evidentiary value were being housed in the storage unit," (4) the "informants' statements were so lacking in detail concerning [Mr.] Bruno's alleged illegal activities that it was impossible to corroborate enough details to establish probable cause," (5) the affidavit failed to establish "the veracity of the informants' statement[s]," and (6) any information about the August 1999 robbery was "stale." (*Id.* at 79-86). The trial court held a suppression hearing, taking testimony from Detective Iverson and another detective. (*Id.*, Ex. 13). After hearing argument from the parties, the court denied the motion to suppress without explanation. (*Id.* at 38).

Mr. Bruno now alleges that counsel "failed to adequately prepare for and perform competently at the suppression hearing." (Doc. 11 at 7). He points to several "deficiencies" in the search-warrant affidavit, including (1) the "[s]taleness" of the information, (2) the failure to explain how the confidential informant, Mr. Nash, or Mr. Schneck "got the purported information they provided," (3) the "double hearsay" nature of the confidential informant's statement that Mr. Bruno "bragg[ed]" about robbing banks, and (4) the absence of any information establishing the "veracity and credibility" of the confidential informant. (*Id.* at 4). Mr. Bruno also complains that the affidavit contained "factual misrepresentations" about his purchases of jewelry and a "vehicle," as well as certain

"omissions."[1] (*Id.*) According to Mr. Bruno, counsel should have raised these points at the suppression hearing. (*Id.* at 7). Finally, Mr. Bruno faults counsel for failing to impeach Detective Iverson at the suppression hearing with allegedly inconsistent statements from his deposition. (*Id.*)

The postconviction court rejected this claim, finding that counsel was "reasonably prepared at the suppression hearing and properly challenged the legality of" the search. (Doc. 18-6, Ex. 49, at 2053). The court began by noting that counsel "sufficiently challenged the search warrant" for "staleness." (*Id.*) As the court explained, the motion to suppress "specifically argued . . . that the property seized from the storage unit should be suppressed because the warrant was stale due to a seven-month delay." (*Id.*) Counsel repeated this point at the suppression hearing. (*Id.*) Thus, the court rejected as "meritless" Mr. Bruno's assertion that counsel "failed to challenge the timeliness of the search warrant." (*Id.*)

The court likewise rejected Mr. Bruno's argument that counsel "failed to challenge the credibility and veracity of" Mr. Schneck, Mr. Nash, and the confidential informant. (*Id.* at 2054, 2056). To the contrary, the court noted that the motion to suppress "specifically challenged the credibility and veracity of Mr. Schneck and Mr. Nash as the 'primary' informants regarding the storage shed." (*Id.* at 2054). And while counsel "did not specifically mention" the confidential informant, he "highlighted how the search warrant's

---

[1] The "omissions" included the alleged facts that Mr. Bruno "volunteered to give a DNA sample so as to be eliminated as a suspect" in the bank robbery, that Mr. Bruno recently "settled a personal injury lawsuit against a cab driver who severely injured and hospitalized him," and that Mr. Bruno "allowed" law enforcement to search his car and motorcycles. (Doc. 11 at 5-6).

application lacked any statement verifying any of the informants' personal knowledge of [Mr. Bruno's] activities and belongings." (*Id.* at 2054-55).

Next, the court rejected as "meritless" Mr. Bruno's argument that counsel should have "challenge[d] the use of double hearsay in the search warrant's application." (*Id.* at 2055). In support, the court cited Florida caselaw holding that "an affidavit for a search warrant may be based on hearsay information." *Parker v. State*, 89 So. 3d 844, 859 (Fla. 2011).

The court then turned to Mr. Bruno's claim that counsel should have impeached Detective Iverson "at the motion to suppress hearing with his prior deposition statements." (Doc. 18-6, Ex. 49, at 2055). As noted above, Detective Iverson discussed Mr. Bruno's jail call in the search-warrant affidavit. During the call, Mr. Bruno said that "all [his] sh*t" was in his storage unit, which Detective Iverson interpreted as a reference to "tools, such as guns, or fruits of the crimes such as dye-stained currency." (Doc. 18-2, Ex. 4, at 2535). During his deposition, Detective Iverson admitted that he did not "specifically" know what Mr. Bruno meant by his reference to "all [his] sh*t." (Doc. 18-8, Ex. 63, at 15). But Detective Iverson clarified that he "took" Mr. Bruno to "mean[]" "stuff" that he "kept from bank[] robberies." (*Id.* at 16). At the suppression hearing, moreover, Detective Iverson reiterated his belief that the phrase "all [his] sh*t" could have referred to "guns or fruits of crime such as dye-stained currency." (Doc. 18-2, Ex. 13, at 21). Thus, the postconviction court found that counsel was not deficient for "failing to impeach [Detective Iverson] with his allegedly inconsistent prior statements." (Doc. 18-6, Ex. 49, at 2056).

Finally, the court addressed the alleged misrepresentations and omissions in the search-warrant affidavit. (*Id.*) The court found no "prejudice" because, setting aside the alleged errors, the remainder of the "information" in the affidavit—"especially in paragraphs nine and ten"—was sufficient to establish probable cause for the search. (*Id.*) Paragraph nine relayed information from Mr. Nash and Mr. Schneck, who told law enforcement that "after the robber[y] on August 6, 1999," Mr. Bruno "went to [Mr.] Schneck's home where he counted the proceeds from the robber[y], and even attempted to . . . bleach the dye-stained money using [Mr.] Schneck's washing machine." (Doc. 18-2, Ex. 4, at 2535). Paragraph ten described the jail call between Mr. Bruno and his ex-girlfriend. (*Id.*) Because this information independently supplied probable cause to search the storage unit, the postconviction court held that any additional "questioning" would not "have resulted in . . . granting [the] motion to suppress." (*Id.*)

The rejection of this claim was reasonable. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which is "different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Richter*, 562 U.S. at 101. Thus, to prevail on his ineffective-assistance claim, Mr. Bruno must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020).

Mr. Bruno cannot make this showing. As the postconviction court explained, counsel challenged the search on most of the grounds Mr. Bruno identifies. Specifically, counsel argued that the affidavit relied on "stale" information and failed to establish "the

13

veracity of the informants' statement[s]." (Doc. 18-2, Ex. 12, at 79-86). Counsel did not raise the hearsay issue, but any such argument would have failed because search-warrant "affidavits may be based on hearsay." *United States v. Wuagneux*, 683 F.2d 1343, 1356 (11th Cir. 1982); *see also Franks v. Delaware*, 438 U.S. 154, 165 (1978) (noting that "probable cause may be founded upon hearsay and upon information received from informants"). Thus, counsel was not deficient for failing to raise Mr. Bruno's meritless hearsay objection. *See Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008) (noting that "[a] lawyer cannot be deficient for failing to raise a meritless claim").

Nor was counsel ineffective for failing to impeach Detective Iverson with his deposition testimony. As the postconviction court explained, Detective Iverson consistently maintained his "belie[f]" that Mr. Bruno's use of the phrase "all [his] sh*t" referred to "tools, such as guns, or fruits of the crimes such as dye-stained currency." (Doc. 18-2, Ex. 4, at 2535; *see also* Doc. 18-2, Ex. 13, at 21; Doc. 18-8, Ex. 63, at 15). Because Detective Iverson's testimony did not involve a "material" inconsistency, counsel had no basis to impeach him. *See Garmon v. State*, 313 So. 3d 1202, 1203 (Fla. 1st DCA 2021) ("To be inconsistent, a prior statement must either directly contradict or be materially different from the expected testimony at trial. The inconsistency must involve a material, significant fact rather than mere details.").

As for the alleged misstatements and omissions, the postconviction court reasonably found that the remainder of the "information" in the affidavit was independently sufficient to establish probable cause for the search. (Doc. 18-6, Ex. 49, at 2056). "Probable cause to support a search warrant exists when the totality of the circumstances allows the conclusion

that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009). If an affidavit contains "misstatements or omissions," a court asks "whether probable cause would be negated if the offending statement was removed or the omitted information included to determine the materiality of the error." *Turner v. Williams*, 65 F.4th 564, 582 (11th Cir. 2023).

Any errors in the affidavit were immaterial. As noted above, the affidavit relied on statements from Mr. Nash and Mr. Schneck, who disclosed that "after the robber[y] on August 6, 1999," Mr. Bruno "went to [Mr.] Schneck's home where he counted the proceeds from the robber[y], and even attempted to . . . bleach the dye-stained money using [Mr.] Schneck's washing machine." (Doc. 18-2, Ex. 4, at 2535). The affidavit also noted that, according to "information from" Mr. Schneck, Mr. Bruno "kept stolen cars and other things" in his storage unit, and Mr. Bruno "was afraid that the FBI was going to find out about" it. (*Id.*) During a subsequent jail call, Mr. Bruno said "all [his] sh*t" was in the unit and "appeared very concerned." (*Id.*) Taken together, these facts "would lead a reasonably prudent person to believe" that the storage unit contained "evidence of a crime." *United States v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011). Thus, the alleged misstatements and omissions did not "negate[]" the probable cause supplied by the informants and the jail call. *Turner*, 65 F.4th at 582.

For all these reasons, the postconviction court correctly held that counsel was "reasonably prepared at the suppression hearing and properly challenged the legality of" the search.[2] (Doc. 18-6, Ex. 49, at 2053).

## B.    Ground Two—Failure to "Prevent" Mr. Bruno from Testifying

Mr. Bruno contends that trial counsel was deficient for failing to "prevent [him] from testifying" at trial. (Doc. 11 at 10). Three days before trial, Mr. Bruno allegedly received "close to" 1,500 pages of "pretrial documents," including depositions and police reports. (*Id.* at 9). According to Mr. Bruno, he was "responsible for organizing and collating all of these documents for defense counsel's use in questioning the trial witnesses." (*Id.*) Mr. Bruno alleges that he "sacrificed his sleeping hours to this clerical task," getting no sleep at all in the days leading up to trial. (*Id.*) Then, during the first three days of trial, Mr. Bruno allegedly "slept less than two hours per night" because he was "work[ing] relentlessly to organize" the "pretrial documents." (*Id.*)

On the last day of trial, Mr. Bruno was "sleep deprived." (*Id.*) He says his "face was almost colorless," his "eyes were swollen, glassy, and bloodshot red," and he was "barely functioning." (*Id.*) Mr. Bruno allegedly told counsel that he was sleep deprived. (*Id.*) "Shortly thereafter," counsel asked Mr. Bruno "if he wanted to testify." (*Id.*) Allegedly

---

[2] Mr. Bruno argues that counsel should have separately challenged the legality of the "first search warrant," which led to the recovery of a dye-stained five-dollar bill. (Doc. 11 at 1-2). The five-dollar bill was cited in the affidavit for the subsequent search that led to the discovery of the .45 caliber bullets. (Doc. 18-2, Ex. 4, at 2535). But even without the five-dollar bill, the second affidavit was sufficient to establish probable cause to search Mr. Bruno's storage unit. Thus, Mr. Bruno was not prejudiced by counsel's failure to challenge the first search warrant. *See United States v. Schultz*, 14 F.3d 1093, 1097 (6th Cir. 1994) ("True, the fruits of the first search were cited in the affidavit for the second warrant; but the second affidavit was sufficient to search the residence even without those fruits, and the second warrant was therefore valid.").

suffering from "diminished mental capacity," Mr. Bruno "agreed to testify." (*Id.*) According to Mr. Bruno, his "presentation on the stand was very poor." (*Id.*) For example, he "was easily agitated from his lack of sleep and used a stern voice and a pointed finger in response to the prosecutor's continued provocation." (*Id.* at 10).

Mr. Bruno argues that counsel "should have prevented [him] from testifying [because he had] slept so few hours in seven days." (*Id.*) Alternatively, Mr. Bruno proposes that "counsel should have informed the court about [his] lack of sleep" and requested a "continuance to allow [him] to get some restful sleep." (*Id.*) A third option, in Mr. Bruno's view, was to "request a curative jury instruction that would have explained [his] abnormal, erratic behavior to jury members." (*Id.*) Mr. Bruno argues that counsel's alleged inaction allowed the prosecution to "utilize [his] poor performance, erratic behavior, and aggressive demeanor to undermine the jury's confidence in the truthfulness of his testimony." (*Id.*)

Mr. Bruno separately alleges that counsel failed "to prepare [him] to testify at trial." (*Id.* at 11). As a result, he was "wholly unprepared for defense counsel's questions and the manner in which counsel intended to style and present [the] defense." (*Id.*)

The postconviction court rejected this claim, ruling that counsel "was not ineffective for allowing [Mr. Bruno] to testify at trial." (Doc. 18-6, Ex. 49, at 2080-81). Based on its "review of [the] trial testimony," the court found that Mr. Bruno's "alleged lack of sleep did not appear to alter his preparation . . . or his cognitive ability." (*Id.* at 2080). Specifically, Mr. Bruno "understood the questions, recalled and used prior trial testimony from other witnesses, and provided detailed information regarding his activities before, during, and after the crime." (*Id.*) Moreover, "a review of [Mr. Bruno's] testimony on

cross-examination reveal[ed] [that he] carefully selected his answers, disagreed with [the prosecutor], and attempted to correct any mischaracterizations." (*Id.*)

The rejection of this claim was reasonable. As an initial matter, counsel could not have "prevented" Mr. Bruno from testifying. (Doc. 11 at 10). "[A] criminal defendant has a fundamental constitutional right to testify in his or her own behalf at trial." *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992) (emphasis omitted). "This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel." *Id.* Thus, contrary to Mr. Bruno's apparent assumption, "[a] criminal defendant cannot be compelled to remain silent by defense counsel." *Id.* Indeed, "if defense counsel [had] refused to accept [Mr. Bruno's] decision to testify and would not call him to the stand, counsel would have acted unethically to prevent [him] from exercising his fundamental constitutional right to testify." *Id.* at 1534.

Regardless, the postconviction court reasonably concluded that counsel did not provide ineffective assistance. The *Strickland* test "has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. [Courts] ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1295 (11th Cir. 2014). Here, "competent counsel" could have advised Mr. Bruno to testify at trial. *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000).

As the postconviction court explained, Mr. Bruno's testimony was cogent and coherent. On direct examination, he clearly presented his defense that Mr. Nash was the shooter. (Doc. 18-3, Ex. 19, at 661-64). Indeed, Mr. Bruno provided a detailed description

of the incident. For example, he testified that Mr. Nash stood between "ten" and "fifteen" feet from "the back of the [victim's] vehicle," that "there wasn't a ton of traffic, but the people that were driving by were still doing the speed limit and the whooshing of the cars was right next to [him]," and that he heard "[l]oud popping, pow, pow, two, possibly three [shots]." (*Id.*) Mr. Bruno also cited "previous [trial] testimony" when explaining that he drove to the nightclub in Hyde Park after the shooting. (*Id.* at 666). Furthermore, he sought to present facts in an exculpatory light, testifying that he "parked [the] car on the street in [the nightclub's] valet parking, in the very best spot that they have. The car wasn't hidden anywhere." (*Id.*) Moreover, Mr. Bruno claimed to remember the exact date he met Ms. Baker—July 26, 2000. (*Id.* at 667).

As for the cross-examination, the postconviction court accurately noted that Mr. Bruno "carefully selected his answers, disagreed with [the prosecutor], and attempted to correct any mischaracterizations." (Doc. 18-6, Ex. 49, at 2080). For example, the prosecutor asked whether Mr. Bruno "decided to start chasing [the victim] and to catch up with him." (Doc. 18-3, Ex. 19, at 703). Mr. Bruno responded, "That's not true. His vehicle was in pursuit of my vehicle the entire time." (*Id.*) Likewise, the prosecutor presented a photograph of Mr. Bruno's car and asked, "[T]his is the same car where you hid it in [a friend's] garage, correct?" (*Id.* at 700). Mr. Bruno said, "No, sir, two-part question. . . . Yes, it is the car. No, it is not hidden. I'm allowed to park in that garage any time I like." (*Id.*)

Given Mr. Bruno's performance on the stand, a reasonable jurist could conclude that "competent counsel" would have advised him to testify. *Chandler*, 218 F.3d at 1315.

Indeed, Mr. Bruno's testimony was the only direct evidence supporting his defense that Mr. Nash was the shooter. As for the alleged lack of preparation, Mr. Bruno failed to "describe in any detail what [counsel] should have better prepared him for." *Heard v. Harrison*, 246 F. App'x 449, 452 (9th Cir. 2007). Before the postconviction court, he did not set forth "the areas of testimony where he was unprepared, the questions he was unprepared to answer, how he was unprepared, or how further preparation would have helped." *Warrick v. Sec'y Fla. Dep't of Corr.*, No. 3:23-cv-24724-LC-HTC, 2024 WL 4806278, at *9 (N.D. Fla. Oct. 17, 2024), *adopted by* 2024 WL 4803371 (N.D. Fla. Nov. 15, 2024). Instead, he baldly asserted that counsel did not "prepare [him] to testify at trial." (Doc. 18-5, Ex. 47, at 91). Such "[c]onclusory allegations of ineffective assistance are insufficient." *Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992); *see also Wilson v. Sec'y, Fla. Dep't of Corr.*, 769 F. App'x 825, 827 (11th Cir. 2019) ("[I]neffective assistance of counsel cannot be proven via conclusory assertion[,] but that is all [petitioner] offered [the state court]. The federal district court was therefore correct in upholding the state court's determination."). Thus, the postconviction court reasonably rejected this claim.[3]

---

[3] For the first time, Mr. Bruno alleges in his federal habeas petition that counsel was deficient for failing to provide him with "crime scene photographs" before trial. (Doc. 11 at 11). This new allegation cannot be considered on federal habeas review. "[A] review of a state court adjudication on the merits in light of allegations not presented to the state court—for example, by examining additional facts or claims presented for the first time in a petitioner's federal habeas petition—would insufficiently respect the historic and still vital relation of mutual respect and common purpose existing between the States and the federal courts." *Borden v. Allen*, 646 F.3d 785, 816 (11th Cir. 2011). Accordingly, this Court "do[es] not consider [Mr. Bruno's] supplemental allegation[] . . . when reviewing the reasonableness of the state court's resolution of this claim, which was based on the allegations before it." *Powell v. Allen*, 602 F.3d 1263, 1273 n.8 (11th Cir. 2010). Even if Mr. Bruno's new allegation could be considered, he fails to establish that he was prejudiced by his inability to review the crime scene photographs.

**C.      Ground Three—Failure to Exclude Prior Road Rage Incident**

Mr. Bruno faults trial counsel for failing to "gain the suppression" of the road rage incident that took place approximately two hours before the murder. (Doc. 1 at 18). During this prior incident, Ms. Baker was driving Mr. Bruno's car while Mr. Bruno sat in the front passenger seat. (Doc. 18-3, Ex. 19, at 235, 313-14). A female driver "cut [them] off," angering Mr. Bruno. (*Id.* at 239, 312). He called the driver a "b*tch," yelled at her through an open window, and grabbed the steering wheel in an attempt to "run her off the road." (*Id.* at 239-40). Mr. Bruno also "kept pulling" the emergency brake, causing the driver to "almost rear-end[] them." (Id. at 240, 315).

Before trial, the prosecution filed a notice of intent to introduce this evidence. (Doc. 18-3, Ex. 25, at 1). Counsel moved *in limine* to exclude the prior incident, arguing that the evidence (1) did not qualify for admission under the *Williams* rule,[4] and (2) was not "inextricably intertwined" with the charged offense. (Doc. 18-2, Ex. 8, at 2183-91). Under Florida law, "evidence which is inextricably intertwined with the crime charged[] is not *Williams* rule evidence." *McGee v. State*, 19 So. 3d 1074, 1078 (Fla. 4th DCA 2009). Instead, such evidence "is admissible under [ordinary principles of relevance] because it is a relevant and inseparable part of the act which is in issue." *Id.*

---

[4] Under the *Williams* rule, similar fact evidence of other crimes, wrong, or acts is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Williams v. State*, 110 So. 2d 654, 663 (Fla. 1959).

The trial court held a hearing on the motion *in limine*. (Doc. 18-2, Ex. 13). The prosecution argued that the prior road rage incident was "inseparably intertwined" with the murder, but that it also "easily [fell] under the *Williams* rule." (*Id.* at 64). In response, counsel maintained that the incident was inadmissible under the *Williams* rule because (1) the two incidents were temporally remote, with a "two-hour time difference" between them, (2) the incidents were not sufficiently similar, and (3) the prior incident was not "relevan[t]" to the charged offense. (*Id.* at 65-67). Counsel also argued that the prior incident was not "inextricably intertwined" with the murder. (*Id.* at 69). According to counsel, "under the inextricably intertwined line of cases what you have . . . are situations where there was a prior relationship between the victim, for instance, in a domestic altercation which eventually led []to a murder." (*Id.*) Here, by contrast, the prosecution offered "two unrelated incidents." (*Id.*) The court ultimately denied the motion without explanation, allowing the prosecution to present the prior road rage incident to the jury. (*Id.* at 78). Counsel did not renew his objections when the evidence was admitted at trial.

Mr. Bruno now contends that counsel "failed to perform adequately" at the hearing on the motion *in limine*. (Doc. 1 at 19). According to him, counsel failed to "argue controlling Florida caselaw to prevent the admission of the [prior] incident." (*Id.*) Mr. Bruno does not identify this caselaw in his petition, nor does he explain how citing caselaw would have led to a different outcome. (*Id.*) Instead, he simply asserts that had counsel performed "adequately," "there is a reasonable likelihood that the trial court would have excluded this collateral act." (*Id.*) He also complains that, by failing to renew the objections at trial, counsel failed to "properly preserve[] [the issue] for appellate review." (*Id.*)

The postconviction court rejected this claim, holding that the "record" refuted Mr. Bruno's allegation that counsel "failed to properly challenge the admissibility of [the prior] road rage incident." (Doc. 18-6, Ex. 49, at 2061-62). The court explained that, at "the pre-trial hearing," counsel "adequately challenged the admissibility of the road rage incident under Fla. Stat. § 90.402 [the general relevance rule], the inextricably intertwined standard, and the *Williams* rule." (*Id.* at 2062). Specifically, "counsel argued that the previous road rage incident was not only irrelevant, but also not inextricably intertwined to the crime because it happened over two hours before the crime ('remoteness') and did not relate to the same victim." (*Id.*) Moreover, as the court noted, counsel "wrote an extensive pre-trial motion *in limine*" challenging "the admissibility of the evidence under the *Williams* rule" and arguing that "the evidence was neither relevant nor inextricably intertwined to the present crime." (*Id.*) Despite these "efforts," the trial court "denied [the] motion *in limine* as it applied to the prior road rage incident." (*Id.*) Thus, the postconviction court concluded that counsel adequately challenged "the admissibility" of this incident. (*Id.* at 2061-62). Likewise, counsel "was not deficient for failing to re-argue the same point at trial" because the trial court "had previously made its determination as to [the prior] road rage incident." (*Id.* at 2062)

This ruling was reasonable. To prevail on his assertion of ineffective assistance, Mr. Bruno must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Franks*, 975 F.3d at 1176. Mr. Bruno cannot meet his burden. As the postconviction court explained, counsel vigorously opposed admission of the prior road rage incident, arguing that it did not qualify as

*Williams* rule evidence and was not inextricably intertwined with the charged offense. (Doc. 18-2, Ex. 13, at 65-69). These arguments failed to persuade the court, but "the fact that a particular [argument] was unsuccessful does not prove ineffective assistance of counsel." *Ward v. Hall*, 592 F.3d 1144, 1164 (11th Cir. 2010). And while Mr. Bruno faults counsel for not presenting "controlling Florida caselaw," he does not identify any caselaw that would have required the court to exclude the prior road rage incident. (Doc. 1 at 19). Thus, Mr. Bruno cannot "establish that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315.

Likewise, the postconviction court reasonably found that Mr. Bruno was not entitled to relief on his assertion that counsel failed "to re-argue the same point at trial." (Doc. 18-6, Ex. 49, at 2062). Mr. Bruno complains that this failure meant the issue "was not properly preserved for appellate review." (Doc. 1 at 19). But *Strickland* "focuses on the outcome at trial, not on appeal." *Ramos v. Dep't of Corr.*, 575 F. App'x 845, 846 (11th Cir. 2014). Indeed, *Strickland* made clear "that when the claimed error of counsel occurred at the guilt stage of a trial (instead of on appeal)," courts "are to gauge prejudice against the outcome of the trial: whether there is a reasonable probability of a different result at trial, not on appeal." *Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006). Accordingly, a reasonable jurist could conclude that the failure to preserve the objection did not entitle Mr. Bruno to relief. *See Carratelli v. Stepp*, 382 F. App'x 829, 832 (11th Cir. 2010) (where counsel raised issue but failed to "properly preserve[]" it for appeal, district court "correctly affirmed the state court decisions holding that the relevant prejudice inquiry should focus on trial, not the appeal").

24

**D.    Ground Four—Failure to Question Mr. Nash and Ms. Baker about
"Earlier Events"**

Mr. Bruno faults trial counsel for failing to cross-examine Mr. Nash and Ms. Baker about "earlier events" that allegedly would have shown their "bias, animosity, and malice." (Doc. 1 at 20). According to Mr. Bruno, several months before the murder, Mr. Nash stole one of his motorcycles. (*Id.*) Mr. Bruno allegedly "reported [it] stolen" and gave police Mr. Nash's name "as a suspect." (*Id.* at 21). "Weeks later," Mr. Nash "threatened [Mr. Bruno] and said he had to be paid back for 'ratting' on [him] to [the] police regarding the motorcycle theft." (*Id.*) According to Mr. Bruno, this incident shows that Mr. Nash "was willing to hurt [him] by any means possible." (*Id.*)

Mr. Bruno separately alleges that Ms. Baker "knocked over" his other motorcycle three days before the murder. (*Id.* at 20). Then, two days after the murder, Mr. Bruno allegedly told Ms. Baker that "she must pay for the damage," which totaled approximately $3,000. (*Id.*) Ms. Baker allegedly "became enraged and hostile toward [Mr. Bruno] and threatened to harm him." (*Id.*) Ms. Baker subsequently "made a statement to police implicating him in the shooting." (*Id.*)

Mr. Bruno argues that, had counsel "inquired of these events when cross-examining" Mr. Nash and Ms. Baker, "the jury would have been made aware that these witnesses harbored animosity and ill will toward [him]." (*Id.* at 21). This, in turn, "would have given the jury specific reasons which motivated these individuals to wrongly accuse [him] of the shooting." (*Id.*)

The postconviction court rejected this claim. (Doc. 18-6, Ex. 49, at 2071). It found that the proposed testimony from Mr. Nash was not "reasonably probable to have resulted in a different outcome at trial." (*Id.*) According to the court, "even if [counsel] had elicited testimony that Mr. Nash stole [Mr. Bruno's] [motorcycle] and then threatened to kill [him] for 'ratting' him out to police a few months before the crime, . . . [Mr. Bruno's] subsequent actions of socializing with Mr. Nash at Hooters, Carrabba's, the Fox Club, Hyde Park cafe, [Mr. Bruno's] father's home, and other friends' homes [were] inconsistent with [Mr. Bruno's] claims." (*Id.*) The court also found that, "in the pre-trial and trial stages," counsel "made reasonable efforts to impeach Ms. Baker and Mr. Nash through their alleged bias and motive." (*Id.*) Specifically, counsel "attempted to demonstrate on multiple occasions how Ms. Baker and Mr. Nash were engaged in a criminal conspiracy to traffic drugs through Ms. Baker's escort service." (*Id.*)

The postconviction court acted reasonably in rejecting this claim. A fairminded jurist could find no prejudice from the failure to cross-examine Mr. Nash about the motorcycle incident. "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. "Applying AEDPA to *Strickland*'s prejudice standard, [this Court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Mr.

26

Bruno]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Mr. Bruno cannot meet this demanding standard. Mr. Nash allegedly threatened Mr. Bruno several months before the murder. (Doc. 1 at 20-21). But Mr. Bruno socialized with Mr. Nash at various locations on the day of the murder, and the two continued to meet up afterwards. (*E.g.*, Doc. 18-3, Ex. 19, at 232-33, 416-22). To be sure, Mr. Nash was upset at Mr. Bruno over the shooting, but nothing in the trial transcript suggests that the two were at odds over the alleged theft of a motorcycle. As the postconviction court explained, the evidence that Mr. Bruno and Mr. Nash regularly socialized around the time of the murder directly contradicts the assertion that Mr. Nash "harbored animosity and ill will toward" Mr. Bruno. (Doc. 1 at 21). In these circumstances, a reasonable jurist could conclude that the proposed testimony from Mr. Nash would "have had an isolated, trivial effect" on "the entire evidentiary picture." *Strickland*, 466 U.S. at 696.

Regardless, as the postconviction court noted, counsel "made reasonable efforts to impeach Ms. Baker and Mr. Nash through their alleged bias and motive." (Doc. 18-6, Ex. 49, at 2071). Both before and during trial, counsel sought to show that Ms. Baker and Mr. Nash were biased against Mr. Bruno because of "their involvement in a criminal conspiracy involving drugs and prostitution." (*Id.* at 2608). Specifically, counsel argued that Mr. Nash was "supplying" Ms. Baker (allegedly an escort) with illegal drugs, and that "she was supplying [the drugs] to her customers." (Doc. 18-3, Ex. 19, at 670-71). According to counsel, Mr. Nash and Ms. Baker asked Mr. Bruno for money "to take [the drug dealing]

27

to the next level." (*Id.* at 671, 678, 693). Mr. Bruno refused, making him a "liability" who "knew too much" about Mr. Nash and Ms. Baker's "criminal conspiracy." (*Id.* at 668, 671). This allegedly gave the two "a motive to eliminate" Mr. Bruno, for example by "blaming [him] for something." (*Id.* at 679).

During trial, the court allowed counsel to question Mr. Nash and Ms. Baker about these matters outside the presence of the jury. (*Id.* at 682-94). Both denied any involvement in dealing drugs. (*Id.* at 684-87, 692). They also denied asking Mr. Bruno for a loan. (*Id.* at 687, 693). Following the proffer, the court ruled the evidence inadmissible, explaining that "this thing [Mr. Bruno] wants to tell this jury is not supported by . . . admissible evidence, and so we can't let him get into it." (*Id.* at 694).

Thus, counsel made a reasonable attempt to impeach both Ms. Baker and Mr. Nash by inquiring into their motive to blame Mr. Bruno for the murder. This motive was different from the one proposed by Mr. Bruno during his postconviction proceedings. But "attorneys are not ineffective for making a reasonable choice to take one avenue to the exclusion of another, or for selecting a reasonable course without considering some other, equally reasonable course." *LeCroy v. United States*, 739 F.3d 1297, 1313 (11th Cir. 2014); *see also Chandler*, 218 F.3d at 1315 n.16 ("If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on."). And while counsel's proposed impeachment failed, "[r]easonable trial strategy does not constitute ineffective assistance of counsel simply because it is not successful." *Graham v. Dormire*, 212 F.3d 437, 440 (8th Cir. 2000).

28

Instead, a petitioner must "establish that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315. A reasonable jurist could conclude that Mr. Bruno failed to make this showing.

### E.    Ground Five—Failure to Impeach Mr. Nash with Prior Inconsistent Statements

Mr. Bruno contends that trial counsel provided ineffective assistance by failing to impeach Mr. Nash with allegedly inconsistent statements from his deposition. (Doc. 1 at 22). At trial, Mr. Nash testified that several days after the murder, Mr. Bruno told him that he had been keeping his car in a friend's garage, and that he subsequently moved it to a "house in Tampa Palms." (Doc. 18-3, Ex. 19, at 425). Mr. Nash further stated that Mr. Bruno asked him to retrieve the car, but he refused because he "didn't want to get in any more trouble than [he was] already in." (*Id.* at 425-26). In addition, Mr. Nash claimed that Mr. Bruno told him that (1) he had "waited until the police were not watching" to move the car from the garage to Tampa Palms, and (2) he had left a note at the garage "saying something about changing the tire." (*Id.* at 426).

At his deposition, Mr. Nash offered essentially the same testimony. (Doc. 40 at 27-29). He stated that after the murder, Mr. Bruno told him he had "moved [the car] to Tampa Palms." (*Id.* at 27). Mr. Nash likewise claimed that Mr. Bruno "asked [him] to move [the car]" from Tampa Palms, but he "refuse[d]" because he "didn't want to get involved." (*Id.* at 28-29). Unlike at trial, however, Mr. Nash did not testify that Mr. Bruno waited for the police to leave before taking the car to Tampa Palms. (*Id.* at 27-29). Nor did Mr. Nash

mention the note about changing the tire. (*Id.*) Instead, Mr. Nash said only that Mr. Bruno did not tell him "how" the car was moved to Tampa Palms. (*Id.* at 27).

Mr. Bruno contends that counsel was deficient for failing to "employ[]" Mr. Nash's "prior inconsistent statements as impeachment material." (Doc. 1 at 23). Respondent maintains that this claim is procedurally defaulted, but the Court need not reach that issue because the claim fails on the merits in any event. *See Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020) ("[A] federal court may skip over the procedural default analysis if a claim would fail on the merits in any event.").

Mr. Bruno cannot show prejudice. There is no "reasonable probability that . . . the outcome at trial would have been different" if counsel had pressed Mr. Nash on the minor inconsistency between his trial and deposition testimony. *Reed*, 767 F.3d at 1261. As noted above, the gist of the testimony remained the same. After the murder, Mr. Bruno told Mr. Nash that he had moved the car to Tampa Palms; he then asked Mr. Nash to retrieve the car, and Mr. Nash refused. (Doc. 40 at 27-29; Doc. 18-3, Ex. 19, at 425). In closing, the prosecution used this testimony to argue that Mr. Bruno "hid" the car in Tampa Palms and "wanted Mr. Nash to go up there and get it for him . . . to get rid of it." (Doc. 18-3, Ex. 19, at 821). The minor inconsistency in Mr. Nash's testimony would have done little to undermine the inference that Mr. Bruno tried to hide the car after the shooting. Thus, Mr. Bruno cannot show that "his lawyer's decision not to impeach [Mr. Nash] on this minor inconsistency would've had any effect on the jury's verdict." *Calder v. Dixon*, No. 23-CV-60762, 2023 WL 8719158, at *13 (S.D. Fla. Dec. 18, 2023).

## F.    Ground Six—Failure to Preserve Vehicles for Forensic Testing

Mr. Bruno faults trial counsel for failing to "preserve" his and the victim's vehicles for "forensic testing." (Doc. 1 at 24). According to Mr. Bruno, a "forensic[] specialist" would have found "gunshot residue" on the "passenger side of [his] car and in the rear seat area," thus proving that Mr. Nash—who sat in the back of the car—was the shooter. (*Id.* at 24-25). Likewise, an expert allegedly would have found no gunshot residue on the "driver's side" of Mr. Bruno's car. (*Id.* at 24). In addition, Mr. Bruno claims that a "forensic[] specialist" would have discovered that his "vehicle was struck from behind by the victim's vehicle." (*Id.* at 25). This "paint transfer" evidence allegedly would have rebutted the prosecution's "theory" that Mr. Bruno "purposely stopped his vehicle solely to confront the victim and escalate the situation." (*Id.*; *see also* Doc. 40 at 12). Instead, the hypothetical expert testimony would prove that the "collision [was] the reason for [the] stop." (Doc. 1 at 25).

The postconviction court rejected this claim for lack of "prejudice." (Doc. 18-6, Ex. 49, at 2046). The court began by noting that Mr. Bruno "did not produce any evidence of paint transfer between the vehicles." (*Id.*) Instead, Mr. Bruno offered only his "speculative assertion that had the vehicles been preserved and tested for possible paint transfer at the time of trial, the test results *might* have revealed that the victim rear ended his car, which would have supposedly supported his claim that he stopped his car due to being rear-ended." (*Id.* at 2046-47). The court likewise found that Mr. Bruno produced no "evidence of the existence of gunshot residue in his vehicle or, for that matter, in the passenger's side of the vehicle." (*Id.* at 2047). Mr. Bruno merely opined that the car "would have had

gunshot residue that *may* have been able to be recovered by testing." (*Id.*) The court declined to "rely on such a speculative assertion that *had* the car been preserved and tested for gunshot residue before trial, it *might* have revealed gunshot residue in the passenger's side of the vehicle, which would have allegedly supported [Mr. Bruno's] theory that Mr. Nash shot the victim." (*Id.*)

The postconviction court reasonably found no prejudice. Mr. Bruno never identified any "forensic[] specialist" who could have provided the testimony he describes. Nor did he show that any expert "had actually reviewed the evidence in his case." *Finch v. Sec'y, Dep't of Corr.*, 643 F. App'x 848, 852 (11th Cir. 2016). "Without some specificity as to the proposed expert's testimony, any assertion that an expert would testify consistently with [Mr. Bruno's] claims [was] mere speculation and [did] not entitle him to [] relief." *Id.* Thus, the postconviction court reasonably concluded that Mr. Bruno's speculative allegations were insufficient to establish prejudice. *See, e.g.*, *Holt v. Sec'y, Fla. Dep't of Corr.*, 489 F. App'x 336, 338 (11th Cir. 2012) (state court reasonably rejected ineffective-assistance claim based on failure to retain expert because "[i]t [was] speculative that an expert witness would in fact have testified" favorably to the defense); *Jimenez v. Sec'y, Dep't of Corr.*, No. 8:19-cv-684-MSS-AEP, 2021 WL 5416150, at *9 (M.D. Fla. Nov. 19, 2021) ("[I]n his post-conviction motion, [petitioner] neither identified an expert who could have testified [favorably to the defense] nor presented an affidavit or testimony to substantiate that testimony. Because [petitioner's] ineffective assistance of counsel claim was speculative, the state court did not unreasonably deny the claim.").

### G.    Ground Seven—Failure to Retain Expert on "Retail Sticker[s]"

Mr. Bruno faults trial counsel for not hiring an expert to testify about the "date coding of the retail sticker" on the box of .45 caliber ammunition found in his storage unit. (Doc. 1 at 26-27). As noted above, this ammunition had the same "make" and "manufacturer" as the .45 caliber shell casing found at the crime scene. (Doc. 18-3, Ex. 19, at 613-14). The box of ammunition "displayed a . . . 'Sports Unlimited' inventory/price sticker with numbers printed on it." (Doc. 1 at 27). Mr. Bruno alleges that his brother-in-law—"formerly a warehouse manager for Sports Unlimited"—was "present in the courtroom and deciphered the stocking date code (January 1988) on the sticker." (*Id.*) Thus, according to Mr. Bruno, the "bullets were more than twelve years old" at the time of the murder. (*Id.*) Mr. Bruno alleges that, had "counsel hired a qualified expert, the true age of the bullets would have been proven." (*Id.*) This allegedly would have enabled Mr. Bruno to "show that the bullets were very old, unused, discarded, forgotten-about detritus from over a decade past." (*Id.*)

The postconviction court rejected this claim, holding that "even if [counsel] erred by not hiring a witness to testify regarding the date coding on the box of ammunition," Mr. Bruno could not "demonstrate prejudice." (Doc. 18-6, Ex. 49, at 2060). The court explained that during cross-examination of Detective Iverson, counsel "highlighted the age of the box of ammunition." (*Id.*) Specifically, counsel noted that the sticker "looked kind of old" and asked Detective Iverson "how long Sports Unlimited ha[d] been out of business." (Doc. 18-3, Ex. 19, at 378-79). He responded that he did not know. (*Id.* at 379). Counsel then asked, "If I told you ten years, would that surprise you?" (*Id.*) Detective Iverson said,

"Could be." (*Id.*) Counsel followed up with: "So that ammunition could be ten years old?" (*Id.*) Detective Iverson said, "It's possible." (*Id.*)

The postconviction court acknowledged that Detective Iverson "later conceded on re-direct examination that the box of ammunition may have been only five years old." (Doc. 18-6, Ex. 49, at 2060). According to the court, however, Mr. Bruno could not "establish that had [counsel] called a witness to testify to the official age of the ammunition it was reasonably probable to change the outcome of the trial." (*Id.* at 2060-61). In support, the court noted that the "[Florida Department of Law Enforcement] firearms examiner" testified that "even if the box of ammunition was ten years old, the ammunition's ability to fire is not based on age, but, rather, on 'the conditions in which the cartridges are kept.'" (*Id.* at 2061 (citation omitted)). Thus, "while establishing the exact age of the box may have allowed [counsel] to argue that the ammunition was old and 'forgotten about,' such an argument [did] not create a reasonable probability that the outcome of the trial would have been different." (*Id.*)

The rejection of this claim was reasonable. Mr. Bruno cannot show that the postconviction court's finding of no prejudice "was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin*, 89 F.4th at 1317. As the court explained, Detective Iverson admitted at trial that the box of ammunition could have been five to ten years old. (Doc. 18-3, Ex. 19, at 379-80). Thus, any testimony that the ammunition was "twelve years old" would have been cumulative—that is, it would have merely "amplifie[d] [a] theme[] presented to the jury." *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644, 660 (11th Cir. 2014). "A petitioner cannot establish ineffective assistance

by identifying additional evidence that could have been presented when that evidence is merely cumulative." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002).

In any event, the age of the ammunition likely made no difference to the verdict. As the postconviction court pointed out, the jury heard that ammunition may be usable even if it is "many decades old." (Doc. 18-3, Ex. 19, at 616). Given this testimony, there is no "reasonable probability that . . . the outcome at trial would have been different" if counsel had established the precise age of the ammunition. *Reed*, 767 F.3d at 1261.

### H.    Ground Eight—Failure to Adequately Impeach Detective Tindall

Mr. Bruno contends that trial counsel provided ineffective assistance by failing to adequately impeach Detective J.D. Tindall, the person in charge of searching Mr. Bruno's residence. (Doc. 1 at 28). Ms. Baker told Detective Tindall that, on the night of the murder, Mr. Bruno was wearing "a pair of boots . . . with the zipper side . . . just above the ankle, [and] with a smooth bottom [and] a pointed toe." (Doc. 18-3, Ex. 19, at 494). Detective Tindall testified that the search of Mr. Bruno's residence failed to uncover "shoes that fit the description." (*Id.* at 495). When Mr. Bruno was arrested, officers seized the boots he was wearing, but they did not match the description either. (*Id.* at 494). Indeed, as Detective Tindall admitted, law enforcement compared Mr. Bruno's boots to footprints found at the crime scene, and "they did not match." (*Id.* at 525-26). Finally, Detective Tindall testified that law enforcement did not "find a firearm" during the search of Mr. Bruno's house. (*Id.* at 495).

Mr. Bruno proposes three avenues of impeaching Detective Tindall. First, counsel allegedly should have "negated" the implication that Mr. Bruno "purposely disposed of the shoes police were searching for." (Doc. 1 at 29). According to Mr. Bruno, he did not wear the shoes described by Ms. Baker on the night of the shooting. (*Id.* at 28). Instead, he wore "low, black leather loafer-style dress shoes with tassels and smooth leather soles." (*Id.* at 28-29). Moreover, Mr. Bruno allegedly "did not hide" the shoes described by Ms. Baker— "they were present in his bedroom closet" during the search. (*Id.* at 28). After Detective Tindall testified, Mr. Bruno's father allegedly "removed" both pairs of shoes from "storage" and "transport[ed] them to court the next day." (*Id.* at 29). Mr. Bruno argues that counsel should have "entered these two pairs of shoes as physical evidence to directly impeach" Detective Tindall's testimony. (*Id.*) The shoes allegedly would have undermined the suggestion that Mr. Bruno was "willing[] to destroy physical evidence to avoid detection." (*Id.*)

Second, Mr. Bruno argues that counsel should have impeached Detective Tindall's testimony that law enforcement did not find a weapon during the search. (*Id.*) According to Mr. Bruno, officers seized his "Smith & Wesson 9mm semi-automatic handgun" when they arrested him. (*Id.*) This was not the murder weapon, but Mr. Bruno told law enforcement that he "was in possession of" the 9mm handgun "on the night of the shooting." (*Id.*) Mr. Bruno says that counsel should have introduced the handgun to impeach Detective Tindall's testimony that law enforcement "was unable to recover any weapon." (*Id.*)

Third, counsel allegedly should have cross-examined Detective Tindall about the "significance" of the finding that the footprints at the crime scene did not match the shoes Mr. Bruno was wearing during his arrest. (*Id.* at 31). These footprints were found in "the grass median that separated the vehicles." (*Id.* at 30). According to Mr. Bruno, he had "reason to believe" that the footprints were "[Mr.] Nash's." (Doc. 18-5, Ex. 47, at 91). Mr. Bruno argues that counsel should have somehow brought this out on cross-examination of Detective Tindall. (Doc. 1 at 31).

The postconviction court rejected this claim. (Doc. 18-6, Ex. 49, at 2075-77, 2081; Doc. 18-7, Ex. 54, at 3247). It began by finding that counsel "was not ineffective for failing to impeach the testimony of Detective Tindall by introducing both pairs of shoes." (Doc. 18-6, Ex. 49, at 2075). The court explained that, although Mr. Bruno "contend[ed] Detective Tindall's testimony misled the jury into believing that [he] destroyed or hid his black boots from law enforcement, the record [did] not reflect any such connotation." (*Id.*) Instead, "Detective Tindall received a description of [Mr. Bruno's] dress boots, searched his home, and was 'unable to find them.'" (*Id.* (citation omitted)). The court additionally found that the prosecution's "purpose in introducing [Mr. Bruno's] dress boots was to highlight that law enforcement conducted a complete and full investigation." (Doc. 18-7, Ex. 54, at 3247 (emphasis omitted)). Moreover, Mr. Bruno could not show "prejudice" because counsel "attempted to impeach Detective Tindall several times throughout the course of his testimony, including the lack of law enforcement's investigation into Mr. Nash, the lack of gunshot residue and forensic evidence, and the fact that [Mr. Bruno's]

shoes did not match any of the shoeprints found at the scene of the crime." (Doc. 18-6, Ex. 49, at 2075-76).

The court also addressed Mr. Bruno's assertion that counsel "was ineffective for failing to introduce [his] Smith and Wesson firearm (9mm) as exculpatory evidence." (*Id.* at 2081). The court found that, in light of "all the [other] evidence" before the jury, there was "no reasonable probability that showing [Mr. Bruno] was armed with another firearm four days after the crime and at the time of his arrest would have changed the outcome of the trial." (*Id.*)

Finally, the court rejected Mr. Bruno's argument that counsel was "ineffective for failing to impeach the testimony of Detective Tindall regarding the significance of the footprints found . . . at the crime scene." (*Id.* at 2076). The court noted that Mr. Bruno offered only his "belie[f]" that "the footprints . . . were significant because he had 'reason to believe that they' were Mr. Nash's." (*Id.* (citation omitted)). The court found that such "belief or speculation [was] not a sufficient basis for relief." (*Id.* at 2077). And even if Mr. Bruno's "belief [were] true," the court found that "such evidence would not establish a reasonable probability that the outcome of [the] trial would have been different." (*Id.*) As the court explained, "[s]imply establishing that Mr. Nash was in the grass of the median [did] not in any way demonstrate that Mr. Nash was the shooter." (*Id.*) Indeed, the "evidence produced at trial" showed that "Mr. Nash approach[ed] the victim's car in the median and subsequently duck[ed] at the time of the shooting." (*Id.*)

Each of these rulings was reasonable. Counsel was not deficient for failing to impeach Detective Tindall with Mr. Bruno's shoes. Detective Tindall testified that law

enforcement did not find "shoes that fit the description" in Mr. Bruno's house. (Doc. 18-3,
Ex. 19, at 495). But the prosecution did not argue that this showed Mr. Bruno's
"willingness to destroy physical evidence to avoid detection." (Doc. 1 at 29). In closing,
the prosecution mentioned the failure to find matching shoes, but only in the context of
rebutting defense counsel's argument that the investigation was marked by "laziness and
incompetence." (Doc. 18-3, Ex. 19, at 138). The prosecution responded that officers
conducted "a complete and thorough investigation," that "they covered all the bases," and
that "they went above and beyond to try to bring evidence . . . to you." (*Id.* at 803).
According to the prosecution, law enforcement "made attempts to do all the things [counsel
was] saying weren't done"—for example, "looking for the shoes that fit the description
that [Ms.] Baker gave them." (*Id.* at 805). In these circumstances, "competent counsel"
could have refrained from introducing Mr. Bruno's shoes into evidence. *Chandler*, 218
F.3d at 1315.

Likewise, the postconviction court reasonably found no prejudice from the failure
to present Mr. Bruno's 9mm handgun. As noted above, this gun was not the murder
weapon. (Doc. 18-6, Ex. 49, at 530-31). Indeed, according to Mr. Nash, Mr. Bruno threw
the murder weapon "in the bay." (Doc. 18-3, Ex. 19, at 423-24). There is no "reasonable
probability that . . . the outcome at trial would have been different" if counsel had
established that Mr. Bruno possessed a different firearm when he was arrested several days
after the shooting. *Reed*, 767 F.3d at 1261; *see also Strickland*, 466 U.S. at 695-96
(explaining that some errors at trial will have only "an isolated, trivial effect").

Lastly, the postconviction court reasonably rejected Mr. Bruno's argument that counsel should have impeached "Detective Tindall regarding the significance of the footprints found . . . at the crime scene." (Doc. 18-6, Ex. 49, at 2076). This argument rests on the supposition that the footprints belonged to Mr. Nash. But, as the postconviction court explained, Mr. Bruno offered nothing beyond his unsupported "belief or speculation" to support this assertion. (*Id.* at 2077). Unsupported speculation is insufficient to warrant habeas relief. *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) (noting that "speculation that the missing [evidence] would have been helpful" is "insufficient to carry the burden of a habeas corpus petitioner"); *Fuqua v. Sec'y, Dep't of Corr.*, 409 F. App'x 243, 246 (11th Cir. 2010) ("Federal habeas relief cannot follow . . . speculation [about the content of testimony].")). Regardless, Mr. Bruno failed to show prejudice because, as the postconviction court correctly explained, "[s]imply establishing that Mr. Nash was in the grass of the median [did] not in any way demonstrate that Mr. Nash was the shooter." (Doc. 18-6, Ex. 49, at 2077).

## I.    Ground Nine—Failure to Object and Move for Mistrial Based on Judicial Bias

Mr. Bruno contends that trial counsel should have objected and moved for a mistrial when the trial court allegedly "commented on [his] guilt and the tenuous . . . nature of the defense theory." (Doc. 1 at 32). The comments were made outside the presence of the jury. The parties and the court were discussing whether Mr. Bruno could impeach Mr. Nash and Ms. Baker with evidence that the two had unsuccessfully sought a loan from Mr. Bruno to finance the expansion of their alleged drug dealing activities. (Doc. 18-3, Ex. 19, at 680-

82). During this discussion, the court made the following remarks: (1) "my concern is that

this conspiracy [between Mr. Nash and Ms. Baker] is in your client's mind, and I'm not

sure you have any proof of that"; (2) "this motive connection is in your client's mind"; and

(3) "[w]hen [Mr. Nash and Ms. Baker] saw [Mr. Bruno] shoot a gun and kill somebody, it

probably did change their attitude [toward him]." (*Id.*)

Mr. Bruno faults counsel for not objecting and moving for a mistrial on the ground

that the court "failed to remain neutral and became personally involved in the case." (Doc.

1 at 32-33). According to Mr. Bruno, "there is a reasonable likelihood that a mistrial would

have been granted," and he would have received "a new trial . . . without a partial jurist."

(*Id.* at 33).

The postconviction court rejected this claim, holding that "counsel was not

ineffective for failing to move for a mistrial after [the trial court] made the aforementioned

statements." (Doc. 18-6, Ex. 49, at 2082). As for the "first and second statements"—that

the conspiracy was in Mr. Bruno's "mind"—the postconviction court found that they did

not reveal that the trial court "was []partial" or had "commented improperly upon the

evidence or [Mr. Bruno's] guilt." (*Id.*) Instead, the comments showed the trial court

"appropriately discussing the relevancy of the testimony that [Mr. Bruno] was about to

proffer, as well as [its] concerns over whether [it] would admit testimony about the

witnesses' prior employment and drug use." (*Id.*) Indeed, the trial court was "rightly

cautious of allowing testimony that would not only 'trash' Ms. Baker and Mr. Nash, but

also require the jury to speculate as to the existence of a potential motive or conspiracy

against [Mr. Bruno] based on what they do for a 'living.'" (*Id.* at 2082-83). Thus, the challenged remarks "were not grounds for a mistrial." (*Id.* at 2082).

As for the third comment—that the shooting may have led Ms. Baker and Mr. Nash to view Mr. Bruno differently—the postconviction court found that it was "neither inappropriate nor demonstrated partiality." (*Id.* at 2084). In context, the remark "was simply challenging [counsel's] theory and evidentiary basis for allowing the proffer, as well as its relevancy." (*Id.*) Thus, counsel had no basis to "move for a mistrial after [the] third statement." (*Id.*)

The rejection of this claim was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a federal court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). Here, the postconviction court found that counsel was not deficient for failing to move for a mistrial because, as a matter of Florida law, the challenged remarks "were not grounds for a mistrial."[5] (Doc. 18-6, Ex. 49, at 2082-84). Thus, the state court "already has told us how the issue[] would have been resolved under Florida state law had [counsel] done what [Mr. Bruno] argues he should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005). This Court is bound by that determination. *See Sutton v. Sec'y, Dep't of Corr.*, No. 8:14-cv-2595-JDW-TGW, 2018 WL 10807877, at *9 (M.D. Fla. Mar.

---

[5] Whether a motion for mistrial would have succeeded in these circumstances is a question of Florida law. *See Fernandez v. Sec'y, Dep't of Corr.*, No. 8:16-cv-2565-CEH-SPF, 2019 WL 3958269, at *8 (M.D. Fla. Aug. 22, 2019) ("Whether a motion would have succeeded under Florida's standard for granting a mistrial is a question of state law.").

22, 2018) ("In rejecting this claim, the state post-conviction court determined that there
was no basis under Florida law to object to the judge's actions, disqualify the judge, or for
a mistrial. Therefore, the state post-conviction court has answered what would have
happened if trial counsel had objected or moved to either disqualify the judge or for a
mistrial on the ground of judicial bias—the objections and motions would have been
denied.").

Because the postconviction court "authoritatively decided as a matter of [Florida]
law" that Mr. Bruno's proposed objections lacked merit, the remainder of the analysis is
straightforward. *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1351 (11th Cir.
2024). It is well established that "[a] lawyer cannot be deficient for failing to raise a
meritless claim." *Freeman*, 536 F.3d at 1233. Therefore, the postconviction court
reasonably concluded that counsel was not ineffective for declining to raise Mr. Bruno's
frivolous objections.[6]

### J.    Ground Ten—Failure to Establish "Accurate Timeline" of Shooting

Mr. Bruno faults trial counsel for not establishing an "accurate timeline" of the
shooting. (Doc. 1 at 34). According to Mr. Bruno, approximately ten minutes were
"unaccounted for" in the prosecution's version of events. (*Id.* at 34-35). The victim's
fiancée testified that he left her apartment "around" 9:30 p.m. on the night of the murder.
(Doc. 18-3, Ex. 19, at 158-59). The apartment was 3.6 miles from the crime scene. (*Id.* at

---

[6] To the extent that Mr. Bruno complains that counsel failed to preserve these objections for appeal, the
Court reiterates that trial-level ineffective-assistance claims "focus[] on the outcome at trial, not on appeal."
*Ramos*, 575 F. App'x at 846.

341). Mr. Bruno alleges that the "shooting occurred at approximately 9:49 p.m." (Doc. 1 at 34). He estimates that the trip from the apartment to the crime scene took approximately seven minutes, leaving "more than ten . . . minutes unaccounted for." (*Id.* at 34-35). Mr. Bruno argues that, had counsel exposed the alleged flaw in this "timeline," the jury would have seen that his "version of events was the only true accounting." (*Id.* at 35 (emphasis omitted)).

The postconviction court rejected this claim. (Doc. 18-6, Ex. 49, at 2085). It found that the prosecution did not "establish[] a specific timeline" at trial, and that Mr. Bruno presented no admissible evidence of "an unaccounted for ten minute gap of time." (*Id.*) The court also held that, even if counsel "erred by failing to establish a specific timeline, [Mr. Bruno] failed to demonstrate prejudice." (*Id.*) The court noted that Mr. Bruno admitted at trial to "driving the [car], interacting with the victim on the highway, and stopping his car on the side of the road just before the murder." (*Id.* at 2085-86). Thus, even if counsel had presented Mr. Bruno's "timeline," there was "no reasonable probability that the outcome of the trial would have been different." (*Id.* at 2086).

This ruling was reasonable. As the postconviction court explained, the prosecution did not present a precise timeline of the incident. Nor did it suggest that the shooting took place at "approximately 9:49 p.m.," as Mr. Bruno maintains. (Doc. 1 at 341). Instead, the prosecution argued only that Mr. Bruno and the victim were chasing each other "at about 9:30" p.m. (Doc. 18-3, Ex. 19, at 120). Moreover, the first officer at the scene testified that he was dispatched at "approximately 9:40" p.m. (*Id.* at 146). In short, the prosecution did not rely on the allegedly flawed timeline posited by Mr. Bruno. Thus, any attack on that

timeline would have done nothing to undermine the prosecution's case. In any event, as the postconviction court noted, Mr. Bruno admitted to "driving the [car], interacting with the victim on the highway, and stopping his car on the side of the road just before the murder." (Doc. 18-6, Ex. 49, at 2085-86). Given these admissions, there is no "reasonable probability that . . . the outcome at trial would have been different" if counsel had raised Mr. Bruno's arguments about the timeline. *Reed*, 767 F.3d at 1261.

### K.      Ground Eleven—Failure to Object and Move for Mistrial Based on Prosecutorial Misconduct

Mr. Bruno contends that trial counsel was deficient for failing to object and move for a mistrial based on seven instances of alleged prosecutorial misconduct. (Doc. 1 at 36-38). The postconviction court correctly rejected this claim. (Doc. 18-6, Ex. 49, at 2086-93). "To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).

First, Mr. Bruno alleges that during two pretrial hearings, the prosecution made inconsistent statements about Ms. Baker's employment. (Doc. 1 at 36). At the first hearing, the prosecution said that Ms. Baker "work[ed] as an escort, [which was] how she met [Mr. Bruno]." (Doc. 18-2, Ex. 13, at 72). At the second hearing, the prosecution stated that the two "met through a mutual friend," that "Ms. Baker was working as a legal secretary at the

time," and that "[t]here's no evidence to suggest that she met [Mr. Bruno] through her work
as an escort." (*Id.*, Ex. 16, at 10, 65). Mr. Bruno argues that the prosecution improperly
used these "inverse oral arguments" to "secure the denial of the defense's pretrial motions
and to guarantee all of the State's motions *in limine* were granted." (Doc. 1 at 36).

As the postconviction court explained, however, "both of these proceedings
occurred months before the trial." (Doc. 18-6, Ex. 49, at 2088). Thus, Mr. Bruno cannot
show "a reasonable probability that the outcome of the trial would have been different had
[counsel] . . . moved for a mistrial." (*Id.*; *see also Fontana v. Jones*, No. 3:15-cv-494-RV-
CJK, 2017 WL 3909693, at *12 (N.D. Fla. July 12, 2017) ("A motion for mistrial would
have been surely denied as a trial does not officially begin until the jury is impaneled and
sworn."), *adopted by* 2017 WL 3902557 (N.D. Fla. Sept. 5, 2017)). Moreover, at the second
hearing, counsel informed the court that the prosecution had previously "stated that Mr.
Bruno met [Ms. Baker] while she was working as an escort." (Doc. 18-2, Ex. 16, at 66).
The prosecution responded, "I was mistaken when I made that statement. . . . I'm in a much
better position to represent that to the [c]ourt in that I've now prepared for trial since that
date [*i.e.*, the date of the first hearing]." (*Id.* at 67). Thus, counsel made the court aware of
the prosecution's inconsistent statements.

Second, Mr. Bruno contends that the prosecutor improperly "inflame[d] the jury"
when he began his opening statement with the following remarks: "May it please the Court,
counsel, he slaughtered him. This defendant, Robert Bruno, slaughtered another human
being." (Doc. 1 at 37). According to Mr. Bruno, the prosecutor "point[ed] his finger" in
Mr. Bruno's face and used a "loud, booming voice" when he made these remarks. (*Id.*) The

postconviction court correctly held that the challenged "statements, along with [the] action of pointing [a] finger at [Mr. Bruno], were not made in bad faith or with the intent to inflame the jury." (Doc. 18-6, Ex. 49, at 2088). Instead, "since [the prosecutor] intended to prove [Mr. Bruno] killed or 'slaughtered' the victim and subsequently presented evidence proving his claim, [the prosecutor's] opening remarks were consistent with the purpose of opening statements." (*Id.*) This ruling was reasonable. Indeed, several "courts have determined that a prosecutor's reference to a murder as 'slaughter' was not constitutionally improper." *Quintero v. Carpenter*, No. 3:09-cv-106, 2014 WL 7139987, at *58 (M.D. Tenn. Dec. 12, 2014) (collecting cases). Thus, as the postconviction court held, counsel was not deficient "for failing to object or move for a mistrial as a result of the State's opening remarks." (Doc. 18-6, Ex. 49, at 2089).

Third, Mr. Bruno argues that the prosecution "contorted the testimony of [Ms.] Baker during her [direct] examination." (Doc. 1 at 37). He points to a portion of Ms. Baker's testimony about the events leading up to the shooting. (*Id.*) The prosecution asked, "Do you remember about what time it was when you all left [Mr. Bruno's house]?" (Doc. 18-3, Ex. 19, at 205). Ms. Baker responded, "8:30." (*Id.*) The prosecution said, "Okay. Sometime in the evening?" (*Id.*) Ms. Baker stated, "Yes, sir." (*Id.*) The postconviction court reasonably concluded that "such questions were not improper and did not amount to the contortion or twisting of Ms. Baker's testimony." (Doc. 18-6, Ex. 49, at 2089). A prosecutor does not commit misconduct where, as here, she asks questions to "clarify prior testimony." *United States v. Rolle*, 432 F. App'x 853, 856 (11th Cir. 2011); *see also United States v. Pugh*, 404 F. App'x 21, 28 (6th Cir. 2010) (no prosecutorial misconduct where

"the government's attorney was simply attempting to focus the witness or to otherwise clarify testimony"). Thus, counsel did not provide ineffective assistance by failing to object.

Fourth, Mr. Bruno asserts that the prosecution "improperly bolstered the testimony" of Sgt. Lou Adan, one of the law enforcement witnesses at trial. (Doc. 1 at 37). At the time of the murder, Sgt. Adan was a homicide detective; before trial he was promoted to sergeant. (Doc. 18-3, Ex. 19, at 383). The prosecution asked Sgt. Adan whether becoming a sergeant was "a promotion" from "your position as a detective in homicide." (*Id.* at 400). Sgt. Adan said, "Yes." (*Id.*) The postconviction court held that the prosecution "did not improperly bolster [Sgt.] Adan because [it] was simply clarifying to the jury that being moved from the position of detective to the position of sergeant [was] a promotion and not a demotion." (Doc. 18-6, Ex. 49, at 2090). This ruling was correct. Improper bolstering occurs when the prosecution makes "an explicit, personal guarantee of credibility, such as assuring the jury that the prosecution would not have brought the case unless the defendant was actually guilty." *United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991). The reference to Sgt. Adan's promotion did not amount to a "personal guarantee of credibility." *Id.* Accordingly, counsel was not deficient for failing to object to this exchange.

Fifth, Mr. Bruno complains that during his cross-examination, the prosecution "knowingly and willfully question[ed] him outside the scope of his direct examination testimony." (Doc. 1 at 37). As the postconviction court explained, however, counsel "raised several objections, including at least fourteen 'outside the scope' objections, throughout

48

the course of [the] cross-examination of" Mr. Bruno. (Doc. 18-6, Ex. 49, at 2091). In these circumstances, a reasonable jurist could conclude that counsel's conduct did not "amount [] to incompetence under prevailing professional norms." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014).

Sixth, Mr. Bruno argues that the prosecution "mischaracterized the evidence by continuously declaring" that he was "the aggressor and 'chased down,' 'pursued,' [and] 'followed behind'" the victim. (Doc. 1 at 38). The postconviction court correctly held that the prosecution "did not mischaracterize the evidence." (Doc. 18-6, Ex. 49, at 2092). As the court explained, "Ms. Baker testified that [Mr. Bruno] was 'chasing' and 'cussing' at the victim and 'went over and got in front of the [victim] and slammed on his brakes." (*Id.*; *see also* Doc. 18-3, Ex. 19, at 209-10, 269-70). The court also noted that Ms. Baker "testified that 'both [vehicles] were following each other at different points' and 'sliding in and out of traffic.'" (Doc. 18-6, Ex. 49, at 2092; *see also* Doc. 18-3, Ex. 19, at 211). Thus, as the postconviction court explained, the prosecution "made reasonable inferences as to the testimony provided at trial and did not mischaracterize the evidence." (Doc. 18-6, Ex. 49, at 2092). Indeed, "[t]he proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence." *Silvia v. State*, 60 So. 3d 959, 977 (Fla. 2011). Counsel was not deficient for failing to raise Mr. Bruno's meritless objection.

Seventh, Mr. Bruno contends that the prosecution made the following improper remark during closing argument: "[H]e's the kind of person to have two road rage incidents within two hours of each other, to get so angry over another person cutting him off that he

would chase this, basically, pleasant woman up Dale Mabry." (Doc. 18-3, Ex. 19, at 814). Counsel objected based on "facts not in evidence," and the trial court sustained the objection. (*Id.*) Mr. Bruno says that counsel should have raised an additional objection— that the remark was "an improper characterization of [him] as the kind of person who commits murder and threatens other community members." (Doc. 1 at 38). The postconviction court found that counsel was "not ineffective." (Doc. 18-6, Ex. 49, at 2066). It explained that the challenged remark simply "highlight[ed] a piece of evidence that the [trial court] had already deemed admissible and inextricably intertwined to the present crime, *i.e.*, the prior road rage incident." (*Id.*) Moreover, "because [counsel's] objection to [the] comment was sustained, any prejudice caused by such a comment was lessened." (*Id.*) In these circumstances, "competent counsel" could have refrained from raising the additional objection proposed by Mr. Bruno. *Chandler*, 218 F.3d at 1315.

For all these reasons, the postconviction court correctly rejected Mr. Bruno's ineffective-assistance claim.

**L.    Ground Twelve—Failure to "Gain the Opportunity" to Question Mr. Nash about Threats to Counsel**

Mr. Bruno faults trial counsel for failing to "secure a ruling allowing questioning" of Mr. Nash about his "verbal threats" against counsel. (Doc. 1 at 39-40). During a pretrial hearing, counsel stated that he had called Mr. Nash's ex-girlfriend and asked her about "drugs or any violence that [Mr. Nash had] committed." (Doc. 18-2, Ex. 16, at 56). Counsel described what happened next:

> [Mr. Nash called and] said "Who is this?" I said, "Attorney Eric Kuske."
> "I'm going to get you." "Who is this?" "Robert Nash." And then I said—

once he said that I said, "I don't want to talk to you." He called back again,
said, "I'm going to get you. I don't care if I have to sue you, if I have to go
to the Bar or whatever I have to do[,] I'm going to get you." I hung up the
phone.

He called [again], I saved it on my message machine at which time he said,
"You think you're going to get"—I forget, I have it on my message machine,
basically he's saying, "You f*ggot," he's cursing me out and saying, "You
think you're going to help Mr. Bruno in this case, you're going to defend a
murderer," and words to that effect and some explicit language I guess
basically, and I just left it on the answering machine.

(*Id.* at 56-57).

The court granted the prosecution's request to exclude this evidence, finding that it
was "not relevant." (*Id.* at 60). Despite this ruling, counsel persisted in arguing for its
admissibility. He contended that the threats showed Mr. Nash's "willingness to be
confrontational, his willingness to act quickly without thinking, his spontaneity, his quick
temperedness." (*Id.* at 62). In counsel's view, this would support the "defense" that Mr.
Nash was the shooter. (*Id.*) The court reaffirmed its ruling, stating that "under no
circumstance [could it] see how that phone call between you and the witness would become
relevant." (*Id.* at 63).

According to Mr. Bruno, the court excluded this evidence based on its mistaken
belief that "there was no way the threats . . . could be brought up at trial because counsel
could not be a witness." (Doc. 1 at 40). Mr. Bruno contends that, had counsel "researched
this issue in a professional and effective manner," the court would have "granted [the]
request to question [Mr.] Nash about his threats at trial." (*Id.*)

This claim rests on a mischaracterization of the record. As the postconviction court
explained, the trial court never said that counsel "could not be a witness at trial." (Doc. 18-

6, Ex. 49, at 2070). Instead, as recounted above, the "clear basis for denying the admissibility of Mr. Nash's threats was their lack of any relevancy." (*Id.*) To be sure, the *prosecution* opined during the hearing that "if it's deemed relevant I guess [defense counsel] is going to take the stand and testify to that." (Doc. 18-2, Ex. 16, at 62-63). But the trial court never mentioned this issue in its ruling. (*Id.* at 60, 63). Thus, the postconviction court reasonably concluded that counsel "did not commit error because he effectively advocated for the[] admissibility" of Mr. Nash's threats. (Doc. 18-6, Ex. 49, at 2070).

## M.    Ground Thirteen—Failure to Obtain Permission to Question Ms. Baker about Firearm

Mr. Bruno argues that trial counsel was deficient for failing to "gain permission" to question Ms. Baker about a conversation that allegedly took place on the night of the shooting. (Doc. 1 at 41). Shortly before the murder, Mr. Bruno, Ms. Baker, and Mr. Nash left Mr. Bruno's house in his car. (Doc. 18-3, Ex. 19, at 205-07, 262, 269). According to Mr. Bruno, as the three stood outside the car in the driveway, Mr. Nash told Mr. Bruno to "go back into the house, get the firearm[,] and bring it along," because "you never know when you might need it." (Doc. 1 at 41).

Counsel sought to elicit this statement during cross-examination of Ms. Baker. Counsel asked, "When Mr. Bruno came to the car, did he have the gun in the little pouch?" (Doc. 18-3, Ex. 19, at 266). Ms. Baker said, "Not when we first went to the car, no." (*Id.*) Counsel followed up by asking, "Did anybody ask him to go back into the house to get it?"

(*Id.*) The prosecution objected on "hearsay" grounds; the trial court sustained the objection. (*Id.*)

Mr. Bruno argues that counsel should have "gain[ed] permission for this line of questioning of [Ms.] Baker." (Doc. 1 at 42). According to him, this exchange "clearly [fell under] one of the exceptions to the hearsay rule." (*Id.*) Mr. Bruno maintains that, had counsel succeeded in questioning Ms. Baker "in this manner" either on cross-examination or as a rebuttal witness, the jury "would have realized [he] was not the person who had anticipated the need for the gun to be brought into the car." (*Id.*)

The postconviction court rejected this claim, finding that counsel "was not deficient in failing to overcome the State's hearsay objection." (Doc. 18-6, Ex. 49, at 2073). Specifically, the trial court "properly sustained [the] objection because it would have been improper hearsay testimony for Ms. Baker to testify that Mr. Nash told [Mr. Bruno] to go back into the house and get his gun because, 'You never know when you might need it.'" (*Id.*) The postconviction court rejected Mr. Bruno's "contention that this out-of-court statement [fell] under the verbal act exception to the hearsay rule." (*Id.*)

The rejection of this claim was reasonable. The postconviction court found that counsel was not deficient because any attempt to overcome the hearsay objection would have failed under Florida law. (*Id.*) Thus, the postconviction court "already has told us how the issue[] would have been resolved under Florida state law had [counsel] done what [Mr. Bruno] argues he should have done." *Herring*, 397 F.3d at 1354-55. This Court is bound by that determination. *See Zeigler v. Sec'y, Dep't of Corr.*, No. 8:17-cv-286-KKM-TGW, 2023 WL 6196862, at *10 (M.D. Fla. Sept. 22, 2023) ("[T]o the extent that the trial court's

ruling was based on a determination that the statement was . . . impermissible hearsay under Florida's evidentiary law, this Court must defer to the state court's interpretation of state law."). As a result, the postconviction court reasonably concluded that counsel was not deficient for failing to overcome the hearsay objection. *See Freeman*, 536 F.3d at 1233 (noting that "[a] lawyer cannot be deficient for failing to raise a meritless claim").

### N. Ground Fourteen—Failure to Inform Trial Court of Alleged Conversation Between Jury and Victim's Family

Mr. Bruno faults trial counsel for failing to inform the trial court that, on the last day of trial, "jurors [spoke] with the victim's family" in the "hallway[] outside of the courtroom." (Doc. 1 at 43). The jurors' "faces" allegedly showed "anger and sympathy." (*Id.*) According to Mr. Bruno, counsel "witnessed" this alleged conversation yet failed to alert the court. (*Id.* at 43-44).

The postconviction court held an evidentiary hearing on this claim. Mr. Bruno testified that he "overhear[d]" his "mother and aunt advising" counsel that they saw the jury speaking with the victim's family. (Doc. 18-5, Ex. 47, at 13). Mr. Bruno also claimed that he asked counsel "what could be done regarding this," and that counsel said "he would handle it." (*Id.* at 14). The victim's sister testified as well. She stated that she and the other members of her family "arrive[d] in the mornings at the beginning of trial together and le[ft] at night together." (*Id.* at 271). According to her, nobody in her family talked to "any of the members of the jury." (*Id.* at 271-72).

The postconviction court rejected this claim, finding the testimony of the victim's sister to be "more credible than that of [Mr. Bruno]." (Doc. 18-6, Ex. 49, at 2043). Based

on its credibility determination, the court found that "there was no conversation between the victim's family members and members of the jury during the course of the trial." (*Id.*) Thus, Mr. Bruno had "failed to meet his burden of proof in establishing that [counsel] was ineffective for failing to inform the trial court of an alleged conversation between the victim's family members and members of the jury." (*Id.*)

The postconviction court acted reasonably in rejecting this claim. Mr. Bruno's assertion of ineffective assistance turned on a credibility determination. The court declined to credit Mr. Bruno's version of events, finding that the victim's sister was "more credible" than he was. (*Id.*) "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011). Mr. Bruno has not shown by "clear and convincing evidence" that the court's credibility determination was erroneous. 28 U.S.C. § 2254(e)(1). Thus, he cannot overcome the "presumption of correctness" afforded to that determination. *Consalvo*, 664 F.3d at 845.

Based on the postconviction court's reasonable determination of the facts—that the jury never spoke with the victim's family—counsel's performance was not deficient. Therefore, the postconviction court reasonably rejected Mr. Bruno's claim of ineffective assistance. *See Franks*, 975 F.3d at 1176 (to prevail on *Strickland* claim under AEDPA, petitioner must show that "no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct").

### P.    Ground Fifteen—Refusal to Reopen Evidentiary Hearing

Mr. Bruno argues that the postconviction court violated his right to due process by refusing to "reopen the evidentiary hearing for several of his [Rule] 3.850 claims." (Doc. 1 at 45-46). This claim is meritless. The Eleventh Circuit has made clear that, "while habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief." *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004). Accordingly, Mr. Bruno's "challenge to the process afforded him in the state postconviction proceeding does not state a plausible basis to grant federal habeas relief, because the claim represents an attack on a proceeding collateral to petitioner's confinement and not the confinement itself." *Ramires v. Sec'y of Fla. Dep't of Corr.*, No. 3:11-cv-435-MW-CJK, 2013 WL 2432937, at *15 (N.D. Fla. June 4, 2013); *see also Carroll*, 574 F.3d at 1366 ("[Petitioner's] claim that the state court violated his due process rights by failing to conduct an evidentiary hearing under Florida Rule of Criminal Procedure 3.850 and 3.851 on his post-conviction . . . claim does not state a claim on which this Court may grant habeas relief.").

Mr. Bruno also "incorporates" an "actual innocence claim into" Ground Fifteen. (Doc. 1 at 46). This claim fails as well. Eleventh Circuit "precedent forecloses habeas relief based on a prisoner's assertion that he is actually innocent of the crime of conviction absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Raulerson v. Warden*, 928 F.3d 987, 1004 (11th Cir. 2019); *see also Cunningham v. Dist. Attorney's Off.*, 592 F.3d 1237, 1273 (11th Cir. 2010) ("[An] assertion of actual innocence, by itself, is not enough."). Because Mr. Bruno fails to establish "an

independent constitutional claim, his freestanding actual innocence claim is not cognizable" on federal habeas review. *Collins v. Sec'y, Dep't of Corr.*, 809 F. App'x 694, 696 (11th Cir. 2020).

### Q.    Cumulative Error

Finally, Mr. Bruno raises a claim of cumulative error, arguing that counsel's "numerous errors and omissions were pervasive . . . and rendered the judicial process and the trial fundamentally unfair." (Doc. 1 at 44). "Under the cumulative error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial." *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014). A cumulative error claim "must fail," however, where none of the "individual claims of error" has "any merit." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Because each individual claim of error lacks merit, Mr. Bruno cannot show cumulative prejudicial effect.[7]

### IV.    Conclusion

Accordingly, the Court **ORDERS**:

1. Mr. Bruno's petition (Docs. 1, 11) is **DENIED**.

2. The **CLERK** is directed to enter judgment against Mr. Bruno and to **CLOSE** this case.

---

[7] To the extent that Mr. Bruno attempts to raise new claims in his reply brief, those claims cannot be considered because they were not included in the petition. *See* Rule 2(c), Rules Governing Section 2254 Cases ("The petition must: (1) specify all the grounds for relief available to the petitioner . . . ."); *United States v. Evans*, 473 F.3d 1115, 1120 (11th Cir. 2006) ("[A]rguments raised for the first time in a reply brief are not properly before a reviewing court.").

3.  Mr. Bruno is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. Bruno must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Mr. Bruno has not made the requisite showing. Because Mr. Bruno is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on February 25, 2025.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE